Filed 10/31/22 P. v. Dorado CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DANIEL DORADO,<br><br>    Defendant and Appellant. | D078342<br><br>(Super. Ct. No. SCD276163)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on October 11, 2022, be modified as follows:

1. <u>At the end of the first paragraph on page 32, after the sentence ending "by examining the amended information," add the following sentence:</u>

> "Although defense counsel indicated during the pretrial hearing that she would need additional time to review the preliminary hearing testimony and amended information, as we discuss *post* at pages 33 and 34, defense counsel had ample opportunity to do so between the pretrial hearing and the time Dorado testified at trial."

2. <u>On page 35, line 10 of footnote 16, the words "footnote 20" are replaced with "footnote 17" so that the sentence reads</u>:

> "But as we later discuss in footnote 17, this case is not governed by *Aguayo*."

There is no change in the judgment.

Appellant's petition for rehearing is denied.

HUFFMAN, Acting P. J.

Copies to:  All parties

2

Filed 10/11/22 P. v. Dorado CA4/1 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DANIEL DORADO,<br><br>    Defendant and Appellant. | D078342<br><br><br>(Super. Ct. No. SCD276163) |

APPEAL from a judgment of the Superior Court of San Diego County, Charles G. Rogers, Judge. Reversed in part and remanded for resentencing.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Over the span of nearly a decade, Daniel Dorado, a local business owner, lured four women to meet him in ostensible job interviews or dates arranged through online dating websites. On each occasion, he provided alcohol to the woman until she was intoxicated or unconscious, and then sexually assaulted her while she was incapacitated. A jury convicted Dorado of committing 20 counts of sex crimes against the four victims, including rape, sexual penetration, and oral copulation of an unconscious or intoxicated person, as well as assault with intent to commit specified sex offenses.[1] The trial court sentenced Dorado to a prison term of 40 years.

Dorado does not challenge whether there is sufficient evidence to support the jury's verdict. He asserts his convictions must be reversed on three grounds. First, he claims he did not receive his constitutionally required notice of the factual basis of two charges on which he was convicted. Second, he claims his convictions on four counts of assault with intent to commit rape, oral copulation, or sexual penetration of an unconscious or intoxicated person must be reversed because each is a lesser included offense of the completed offenses of rape, oral copulation, or sexual penetration of an unconscious or intoxicated person for which he was convicted. Third, in supplemental briefing, Dorado asserts the trial court committed instructional error in connection with the charges of aggravated sexual assault. We find no merit to these claims.

---

[1] The District Attorney charged Dorado with committing 35 counts of sex crimes against a total of eight women on eight separate occasions. The jury acquitted Dorado or failed to reach verdicts on counts involving the other four women. The trial court later dismissed without prejudice the counts on which the jury hung. A summary of all 35 counts, the jury's verdicts, and the trial court's sentencing decisions are provided in the attached Appendix.

Dorado raises numerous issues regarding his sentence. He contends that categorizing him as a violent felon based on his aggravated sexual assault convictions under Penal Code[2] section 667.5, subdivision (c)(15), which reduces the rate at which he earns conduct credits, violates his constitutional rights to due process and equal protection. We reject this claim. However, we conclude that we must vacate Dorado's sentence in light of two new laws that became effective while this appeal was pending. First, Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567) amended section 1170, subdivision (b), to limit the situations under which an upper-term sentence could be imposed. Second, Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Assembly Bill 518) amended section 654 to change the discretion of sentencing courts as to which of multiple prison terms to stay or execute. The trial court's sentencing decisions are affected by both of these statutory amendments. Consequently, we vacate Dorado's sentence and remand for resentencing under the current versions of sections 1170, subdivision (b), and 654. We also vacate any portion of the $154 criminal justice administration fee imposed pursuant to now-repealed Government Code section 29550.1 that remains unpaid as of July 1, 2021. We affirm the judgment in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*The Evidence*

Dorado was charged in an amended information with 35 felony counts of sex crimes committed against eight different women. The jury convicted

---

[2] Further unspecified statutory references are to the Penal Code.

3

Dorado on 20 counts involving four women: Jane Does 1 through 4.[3] The jury failed to reach verdicts as to 12 counts, including two counts involving Jane 2 and 10 counts involving Jane Does 5 through 7. The trial court later dismissed these counts without prejudice. The jury acquitted Dorado on three counts involving Jane Doe 8. (See Appendix.) Because Dorado does not challenge the sufficiency of the evidence to support the convictions, we limit our factual summary to the trial evidence relating to the guilty counts only, focusing on the facts that relate to the issues he raises on appeal.

A.     *Jane 1 (Counts 1 through 7)*

In 2009, 31-year-old Jane 1 was working part-time doing promotional work for Dorado's car dealership business. On December 23, Dorado asked to meet with her in person to discuss a full-time position. He told her to meet him at a coffee shop in the late afternoon that day. Jane 1 had recently been laid off, and her husband had lost his job, so she was interested in the opportunity.

Jane 1 arrived and parked outside the coffee shop. Dorado pulled into the parking lot in a Corvette. He told Jane 1 the coffee shop was too noisy and crowded, and suggested they go somewhere else. He invited her to get in his car, and she agreed.

After stopping briefly at his residence, Dorado parked his car in the parking lot of a nearby train station. He opened a bottle of champagne, filled two champagne glasses, and handed one to Jane 1. She accepted the champagne to be polite, and they drank as Dorado drove around and pointed

---

[3]     We subsequently refer to these four victims as Jane 1, Jane 2, Jane 3, and Jane 4.

4

out equestrian properties.  Dorado threw the empty champagne bottle and Jane 1's champagne glass, but not his own, out the window of his car.

Dorado then drove to a hotel.  By the time they arrived at the hotel, Jane 1 was feeling "[b]uzzed" and a little dizzy and unsteady from the champagne.  She felt different from how she would normally feel after drinking one glass of champagne.

Dorado directed Jane 1 to a bar inside the hotel.  Without asking her if she wanted a drink, he ordered them each a glass of wine.  After drinking from her glass, Jane 1 went to the restroom.  When she returned, Dorado had ordered her a second glass of wine even though her first glass was still half full.  She finished the first glass of wine and drank from the second glass.

Jane 1 went to the restroom again.  She became very dizzy and unsteady, and had to put her hands on the walls of the bathroom stall to steady herself.  She tried to send her husband a text message but did not remember sending it.  Based on her previous drinking experience, the way she was feeling was not consistent with the amount of alcohol she had consumed.  When she left the restroom, Dorado was sitting in a chair in the hallway.  He pulled her onto his lap and tried to kiss her, but she turned away.

After this point, Jane 1's memory became blurry, and she had difficulty giving a timeline of events.  She remembered Dorado giving her a glass of Amaretto, from which she took a couple sips, and a glass of Courvoisier, which she also sipped.  She vaguely remembered holding the handrail next to some steps.  She remembered "being seat-belted into . . . Dorado's car and feeling vomit in [her] mouth."  Dorado later told her she had vomited inside his car.

5

The next thing Jane 1 remembered was waking up in a dark room. She was on a bed, and Dorado was there. She was nude except for her bra, which was over her shoulders but was unfastened so that her breasts were exposed. She felt pain in her rectum, and she smelled vomit in her hair. She did not know where she was.

She was scared and asked Dorado for her belongings. She put her clothes on. As she walked downstairs, she saw vomit all over the stairs, wall, and carpet. She asked Dorado what had happened, but he was dismissive. He just told her she was "very drunk" and "kind of laughed it off." Jane 1 told him she smelled vomit, and he said she had vomited in his car. He drove her back to the coffee shop parking lot where she had left her car. While they were driving, she asked Dorado what happened several times. He continued to dismiss her questions, telling her she got very drunk. She told him she was married, and he told her not to tell her husband "[w]hat had just happened."

It was around midnight when Dorado dropped Jane 1 off at her car. When she got home, her husband told her she smelled of vomit and looked like she "was drugged or something." He asked where she had been, but she "didn't have any words." He called the Sheriff's Department, and a deputy responded to their home. The deputy asked Jane 1 if she believed Dorado had raped her; she told him she did not know. She felt uncomfortable talking to the deputy, "a man that [she] didn't know." After the deputy left, Jane 1 used the restroom. When she finished, she found blood in the toilet, enough to "fill [up] the toilet bowl." The blood could have been coming from her vagina. She took a shower and went to bed.

The following morning, Jane 1 went to a women's clinic and reported that she believed she had been raped. Unlike with the deputy, Jane 1 felt

6

safer at the women's clinic. A woman at the clinic contacted law enforcement. At a detective's request, Jane 1 drove to a police station to report "what happened[.]"

Jane 1 underwent a sexual assault examination, performed by a nurse on the Sexual Assault Response Team (SART). Jane 1 reported pain in her vaginal, anal, and perineal areas. The nurse observed visible trauma on Jane 1's genitals and on her anal and rectal area. There was an abrasion on her hymen, visible erythema, or redness, on her cervix, and multiple lacerations on her anus and "copious" blood in her anal canal.

Jane 1's genital injuries were consistent with blunt force trauma caused by a penis being inserted into her vagina. They were also consistent with fingers or a foreign object being inserted into her vagina. Jane 1's anal and rectal injuries were consistent with "being caused by a penis," being caused by fingers, and being caused by a foreign object. Jane 1 also sustained non-genital injuries, including bruises on her left arm and left hip. A day or two after her SART exam, Jane 1 developed a large yellow bruise on her breast.

A forensic criminalist identified blood on external genital swabs, vaginal swabs, rectal swabs, and external anal swabs collected during Jane 1's SART exam. There was a semen stain on her bra and another semen stain on the inside crotch area of her underwear. The genetic profiles from the sperm fractions of the stains matched Dorado's genetic profile. The presence of sperm on the inside crotch of the underwear was consistent with semen being deposited in the vagina and draining out onto the underwear if the underwear was put on after intercourse occurred.

B.     *Jane 2 (Counts 12 through 16)*

In April 2015, 23-year-old Jane 2 responded to an online advertisement for a hostess position at a local restaurant owned by Dorado. Dorado contacted her and suggested she come to the restaurant for an interview at 9:30 p.m. on April 27. When Jane 2 arrived at the restaurant, Dorado asked her to wait outside and brought her a glass of wine. Around half an hour later, Dorado invited Jane 2 inside to start the job interview. There were a couple of workers in the restaurant but no customers. Dorado poured her another glass of wine.

Shortly after the interview started, Jane 2 lost consciousness. The next thing she remembered was waking up "with a sensation of vomit." Dorado took her to the restroom with his arm across her shoulders. She felt very dizzy and had difficulty walking. She vomited in the restroom as Dorado waited by the restroom door. Jane 2 had experience "drink[ing] a lot of drinks" but had never lost consciousness or vomited from alcohol consumption before.

Dorado walked Jane 2 back to the restaurant lobby. She lost consciousness again. When she woke up, she was on the floor with no clothes on. Dorado was on top of her with his penis inside her vagina. She tried to push him off but she did not have the strength. She lost consciousness again.

Jane 2 woke up to the sound of the restaurant's phone ringing. She was in the lobby of the restaurant, and she was still nude. Dorado answered the phone and told Jane 2 it was her mother. His demeanor was "oppressive." He told Jane 2 to tell her mother that everything was fine. It sounded like a threat. Jane 2 was scared and felt that if she did not comply, "something worse would happen." So she told her mother what Dorado had instructed her to say. When she hung up, Dorado told her not to tell anyone

8

what had happened. Jane 2 left the restaurant and drove home. She had pain in her vagina. When she got home, she told her mother the truth. Her mother took her to the hospital for an examination.

After arriving at the hospital, Jane 2 contacted the police and underwent a SART exam. During the SART exam, Jane 2 reported she had experienced memory loss, an "altered level of consciousness," pain in both breasts, and pain in her genital area. She had petechiae, or small broken blood vessels, on each breast, which were consistent with injury from sucking or biting of the breast. There was a laceration on Jane 2's labia minora, and multiple lacerations on her perineum. She sustained an abrasion to her vaginal wall that was accompanied by blood and bruising. Her injuries were consistent with being caused by a penis. They were also consistent with being caused by fingers, and with being caused by a foreign object.

C.    *Jane 3 (Counts 28 through 30)*

On December 26, 2017, Dorado reached out to 41-year-old Jane 3 through an online dating site. She answered his email, and they agreed to meet at a local hotel the next day. Jane 3 arrived at the hotel in the evening on December 27. Dorado was waiting for her outside the lobby with two drinks in martini glasses. The drinks were reddish-pink and appeared to be Cosmopolitans. Jane 3 did not see where they came from. She and Dorado sat in the lobby and talked for a few hours. They each consumed three or four Cosmopolitans over the course of their conversation. After having drinks in the lobby, they went to a fire pit area where they shared a salad and had another round of Cosmopolitans. When Jane 3 stood up, she lost her balance and fell to the ground. A waiter helped her to stand up. Jane 3 then went with Dorado to his hotel room.

Jane 3 provided two different accounts of what happened next.  In an interview with a detective, a recording of which was played for the jury, Jane 3 said she could not remember what happened after the waiter helped her get up off the ground.  She woke up the next morning in a hotel room.  There was vomit all over the bed and all over the floor.  And she was naked.  She "could tell just by [the fact that she] was naked" and "the way the pillows were, the way [her] hair was" that she had had sex with Dorado.  They had sex again that morning, even though there was "vomit everywhere."

Jane 3 told the detective she had been embarrassed by the vomit and had told Dorado she must have had too much to drink.  She said it was out of character for her to drink until she got drunk.  The way she felt afterwards "didn't feel like a hangover."  She had told her girlfriends, "it wasn't . . . like [being] intoxicated."  She "just . . . felt ill."  She first thought there was "something in [her] drink."  Later, she attributed the vomiting to not having eaten all day and then "just kinda wrote it off[.]"  She ended up becoming friends with Dorado and had drinks with him again, but "[she] never really felt like [she] felt the first night."

Jane 3 told the detective that after their initial encounter, she had sex with Dorado two more times before their relationship became nonsexual.  She said, "the other two times were consensual" and "there was no alcohol involved."  She described Dorado as extremely sexually aggressive.  He had bitten Jane 3's breasts before, but she could not remember if she had bite marks on her breasts after their first date.

Jane 3 told the detective she had loaned Dorado $20,000 in February 2018.  The day before she was interviewed, Dorado had asked Jane 3 to loan him more money, and they had argued about whether she would give it to him.  Jane 3 asked the detective what would happen to her if Dorado found

10

out she spoke to law enforcement. She did not want him to destroy her business or harass her. Jane 3 said, "[H]e's mean like that. He will." She asked if he could go to jail and told the detective, "I don't want it to happen to other people. . . . It's horrible."

But when Jane 3 testified at trial a year later, she gave a different account of what happened when she first met Dorado on their date. At the time of trial, Jane 3 was still friends with Dorado. She had even talked to him about having a child together, and she had "helped him with his bail." Jane 3 testified that after she fell down near the fire pit at the hotel, she and Dorado had "mutually agreed" to go back to his hotel room. Jane 3 vomited in the bathroom of the hotel room and then vomited again 30 minutes later. After she vomited, she and Dorado went to sleep. In the middle of the night, they "woke up and had consensual sex." They had consensual sex again in the morning. Jane 3 denied telling the detective she could not remember what happened between the point when she fell down near the fire pit and woke up in the morning in the "bed of vomit."

D. *Jane 4 (Counts 31 through 35)*

In January 2018, Dorado contacted 57-year-old Jane 4, who was recently separated from her husband, through an online dating website. She agreed to meet him at his restaurant.

Jane 4 arrived at Dorado's restaurant at noon on January 21. He was waiting for her outside. When they entered the restaurant, she saw that it was closed, which surprised her and made her very uncomfortable. She used the restroom. Afterwards, she found Dorado preparing drinks in the kitchen. He emerged with martini glasses that contained a cloudy pink or red beverage. She did not see him prepare the drinks.

11

After consuming most of her drink, Jane 4 started feeling its effects. The drink was "very strong" and the effect of it "hit [her] like a wave." It seemed stronger, and made her feel differently, than when she had previously drank a Martini. Dorado brought her a second pink Martini, which she also drank.

Jane 4 asked for something to eat. Dorado took her to another restaurant in his car. As he drove, he drank from an open bottle of champagne, from which Jane 4 took two sips. Jane 4's memory became patchy and she felt like she was "ready to pass out." The next thing Jane 4 remembered was arriving at the second restaurant. She was having difficulty walking, and Dorado was guiding her by her arm. She started going in and out of consciousness. She recalled seeing Dorado walking toward her carrying two more Martinis. She thought it was unusual that Dorado, rather than the waitress, was bringing the drinks.

Jane 4 then remembered waking up naked in a hotel room bed. She sat up and saw Dorado sitting on the floor, watching television and eating. She had no memory of taking off her clothes. She passed out again. When she woke up, Dorado had his hand on her head and was forcing her to orally copulate him. He was moving her head forcibly, hurting her neck. His penis made her gag and she started to vomit. She did not want to orally copulate him. She passed out again.

She woke up to find herself orally copulating him again. When she realized what was happening, she moved away. The next thing she remembered was Dorado "sucking on [her] breast" so hard that it hurt her. She told him he was hurting her and asked him to stop, but he did it again two more times. Jane 4 tried repeatedly to wake herself up so she could leave, but each time she was overcome by a feeling of grogginess. After

12

receiving calls from family members on her cell phone, she told Dorado she had to get home to her children. She got dressed, he took her back to her car, and she drove home.

The next day, Jane 4 felt pain in her neck, breasts, and vaginal area. There were bruises on her breasts, which she photographed. A few weeks later, she contacted the police and reported that she had been sexually assaulted.

E.  *Dorado's Defense*[4]

Dorado admitted he had engaged in sexual acts with all four victims but claimed that each woman had consented. He testified he would never have sex with a woman who was unconscious, and he had never put an illegal substance in anyone's drink in order to have sex with them.

Dorado testified when he was with Jane 1 at the hotel, she told him she was "buzzed." She asked to go to his house to "sleep it off." When they got to his house, he left her in the guest bedroom and went to get her a glass of cranberry juice from the kitchen. When he returned, she was wearing only her bra and underwear. She "turned her rear" to him and asked him to have sexual intercourse with her. He declined. Jane 1 grabbed his hand and put it "into her private parts" while holding his wrist. He believed she consented to the sexual contact.

Dorado testified he had offered wine to Jane 2 just as he does with everyone. After drinking it, she did not feel well, and he escorted her to the restroom. Then he offered her another glass of wine. He did not put

---

[4]  Again, because Dorado does not challenge the sufficiency of the evidence to support his convictions, we need not summarize his entire defense case, which included an expert on sexual assault drugs and character witnesses.

anything in her drink. As they talked, they got flirtatious. Jane 2 asked him to sit down. He complied, and she orally copulated him, which "led to sex."

He recalled Jane 3 falling on the ground at the hotel. The patio surface had crevices and her shoe got caught in one of the grooves. He testified when they went to his hotel room, Jane 3 was conscious and talking, and not incoherent. He did not have to hold her up. Jane 3 made it "very clear" she was interested in having sex with him. She orally copulated him, and they had sexual intercourse. At some point, Jane 3 got sick and threw up in the hotel room. He did not feel Jane 3 was too intoxicated to consent. He denied he put anything in her drinks.

Dorado testified he did not force Jane 4 to orally copulate him. She was lying down near the edge of the bed, and he supported her head with his hand.

On cross-examination, the prosecutor questioned Dorado in detail about his encounters with each victim. Dorado admitted receiving three pretext calls. Relevant here, the prosecutor asked Dorado about a pretext call he received from Jane 1.[5] Dorado testified he did not remember telling Jane 1 about a plan to have "ass sex." He agreed he admitted putting his fingers inside of Jane 1's vagina during the call. When the prosecutor asked Dorado whether during the call, he had admitted to having sexual intercourse with Jane 1, he responded, "Whatever I said, I said." He admitted Jane 1 had asked him, "Did you come inside me[?]," and he had told her that he "didn't remember."

---

[5] The exhibits admitted in evidence at trial did not include a recording or transcript of the pretext call.

F. *Prosecution Rebuttal*

The prosecution called a detective who testified about the content of Dorado's pretext calls and his police interview. In the pretext call from Jane 1, Dorado talked about "a plan to have 'ass sex' " but denied "penile and vaginal sex." In the interview with the detective, Dorado claimed Jane 1 was " 'very aggressive' " with him, and he denied having intercourse with her. He stated the injuries on Jane 1's vagina "were from his long nails[.]"

## II.

### *Jury's Verdict and Sentence*

As to Jane 1, the jury found Dorado guilty of assault with intent to commit rape, sodomy, oral copulation, or sexual penetration (count 1; § 220, subd. (a)); rape of an unconscious person (count 2; § 261, subd. (a)(4)); rape of an intoxicated person (count 3; § 261, subd. (a)(3)); sexual penetration of an unconscious person (counts 4 and 6; § 289, subd. (d)); and sexual penetration of an intoxicated person (counts 5 and 7; § 289, subd. (e)).

As to Jane 2, the jury found Dorado guilty of assault with intent to commit rape, sodomy, oral copulation, or sexual penetration (count 12; § 220, subd. (a)); rape of an unconscious person (count 13; § 261, subd. (a)(4)); rape of an intoxicated person (count 14; § 261, subd. (a)(3)); oral copulation of an unconscious person (count 15; former § 288a, subd. (f)); and oral copulation of an intoxicated person (count 16; former § 288a, subd. (i)).[6]

As to Jane 3, the jury found Dorado guilty of assault with intent to commit rape, sodomy, oral copulation, or sexual penetration (count 28; § 220,

---

[6]    As we have noted, the jury failed to reach verdicts on two counts of sexual penetration of an unconscious person (count 17; § 289, subd. (d)) and sexual penetration of an intoxicated person (count 18; § 289, subd. (e)) as to Jane 2. These charges were dismissed without prejudice.

15

subd. (a)); rape of an unconscious person (count 29; § 261, subd. (a)(4)); and rape of an intoxicated person (count 30; § 261, subd. (a)(3)).

As to Jane 4, the jury found Dorado guilty of assault with intent to commit rape, sodomy, oral copulation, or sexual penetration (count 31; § 220, subd. (a)); oral copulation of an unconscious person (counts 32 and 34; former § 288a, subd. (f)); and oral copulation of an intoxicated person (counts 33 and 35; former § 288a, subd. (i)).

The trial court sentenced Dorado to a total prison term of 40 years. The court imposed the upper term of six years on counts 1, 12, 28, and 31, and the upper term of eight years on counts 2 through 6, 13 through 15, 29, 30, 32, and 34. The court executed the eight-year sentences on counts 3, 5, 14, and 30 and ran them consecutively,[7] for a total of 32 years, and stayed execution of the remaining upper-term sentences under former section 654.[8] The court imposed consecutive sentences of two years (one-third the middle term of six years (former § 1170.1, subd. (a)) on counts 7, 16, 33, and 35,[9] for a total of eight years. (See Appendix.)

---

[7] The court selected count 5 as the principal term under former section 1170.1, subdivision (a). It imposed full-strength sentences on counts 3, 14, and 30 under section 667.6, subdivision (d).

[8] "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." (Former § 654, subd. (a).)

[9] The court selected counts 7, 16, 33, and 35 as subordinate terms under former section 1170.1, subdivision (a).

DISCUSSION

I.

*Dorado Was Not Deprived of His Constitutional Right*
*to Notice of the Charges Against Him*

At a pretrial hearing, the People were granted leave to file an amended information that added two charges involving Jane 1: sexual penetration of the genital opening of an unconscious person (count 4; § 289, subd. (d)), and sexual penetration of the genital opening of an intoxicated person (count 5; § 289, subd. (e)). The amended information also contained, as to Jane 1, the charges of rape of an unconscious person (count 2; § 261, subd. (a)(4)) and rape of an intoxicated person (count 3; § 261, subd. (a)(3)), initially alleged in the original information and the second amended complaint.

Dorado claims a violation of his due process right to notice of the charges against him. Based on the prosecutor's oral description of the amended information, Dorado contends he believed counts 4 and 5 were asserted in the alternative to counts 2 and 3. He claims he understood he was being prosecuted for a single act of vaginal penetration, and that he was not on notice he was being prosecuted for two separate acts of penetration of Jane 1's vagina. We conclude there was no due process violation.

A.     *Additional Background*

In a second amended complaint, Dorado was charged with, among other counts, the following four counts involving Jane 1: rape of an unconscious person (count 21; § 261, subd. (a)(4)); rape of an intoxicated person (count 22; § 261, subd. (a)(3)); sexual penetration of "the genital and anal openings" of an unconscious victim "by a foreign object" (count 23; § 289,

subd. (d)); and sexual penetration of an intoxicated person (count 24; § 289, subd. (e)).[10]

At the preliminary hearing, Jane 1 testified that her last conscious memory after drinking alcohol with Dorado was being seated in his sports car and starting to vomit. Her next memory was waking up in a dark room, nude except for her bra, which was unhooked and out of place, exposing her breasts. She felt pain in her "genitals area," and she felt "anal pain." After she got home, she used the toilet and found blood in the toilet bowl. She testified it was possible she was bleeding both vaginally and anally, but she could not be certain.

For purposes of the preliminary hearing, the parties stipulated to the forensic evidence that would be offered by law enforcement witnesses. The stipulation provided the SART nurse who examined Jane 1 would testify she observed a small abrasion on the right side of the hymen, focal redness on the cervix, and two small lacerations on the anal fold. She also observed moderate fresh bleeding in the anal canal. The stipulation further provided the forensic analyst would testify she identified blood on the external vaginal swabs, rectal swabs, and external anal swabs collected during Jane 1's SART exam. No semen was detected on any of the swabs. There were semen stains on Jane 1's bra and underwear that matched Dorado's genetic profile.

At the conclusion of the evidence, defense counsel did not challenge that there was sufficient evidence to hold Dorado to answer to count 23 for sexual penetration of "the genital and anal openings" of an unconscious

---

10    At all times, Dorado was also charged with assaulting Jane 1 with the intent to commit rape, sodomy, oral copulation, sexual penetration in violation of section 220, subdivision (a). This charge is not relevant to Dorado's due process claim, so we do not discuss it here.

victim "by a foreign object" and count 24 for sexual penetration of an intoxicated person. However, defense counsel argued Dorado could not be held to answer to the rape charges in counts 21 and 22, on the ground there was no evidence of sexual intercourse. The prosecutor argued that although semen was not detected in Jane 1's vagina, the semen stains on her clothing supported an inference of sexual activity that resulted in ejaculation, which, when combined with the evidence of her vaginal injuries, was sufficient to support a probable cause finding on the two counts of rape. Defense counsel responded the forensic evidence showed "[t]here may have been digital penetration" but did not establish sexual intercourse. Defense counsel argued the lack of semen in Jane 1's vagina indicated there was no sexual intercourse. He further argued while there were "some injuries in the vagina," the cause was not established; they could have been caused by "a finger . . . a stick . . . anything." The prosecutor then argued the focal redness on the cervix "does imply that penetration was deep, deeper than a finger is able to go." The magistrate found "[this] last fact . . . gets us to a probable cause finding that the object inserted was a penis and would support intercourse." Accordingly, Dorado was held to answer on counts 21 through 24 of the second amended complaint, among other counts.

The prosecution filed an information with the same four counts involving Jane 1 as alleged in counts 21 through 24 of the second amended felony complaint, but renumbered them as counts 17 through 20, as follows: rape of an unconscious person (count 17; § 261, subd. (a)(4)); rape of an intoxicated person (count 18; § 261, subd. (a)(3)); sexual penetration of "the genital *and* anal openings" of an unconscious victim "by a foreign object" (count 19; § 289, subd. (d), italics added); and sexual penetration of an intoxicated person (count 20; § 289, subd. (e)).

19

At a hearing held 20 days before the parties gave their opening statements at trial, the prosecutor presented an amended information for filing. In place of counts 17 through 20 in the original information, the amended information alleged the following six counts involving Jane 1:

- <u>Count 2</u>, rape of an unconscious person (§ 261, subd. (a)(4)) and <u>count 3</u>, rape of an intoxicated person (§ 261, subd. (a)(3)); both renumbered from counts 17 and 18 of the original information, respectively.

- <u>Count 4</u>, sexual penetration of the genital opening of an unconscious person with an unknown object (§ 289, subd. (d)) and <u>count 6</u>, sexual penetration of the anal opening of an unconscious person with an unknown object (§ 289, subd. (d)). These two counts were newly added and replaced count 19 of the original information, which had alleged sexual penetration of "the genital *and* anal openings" of an unconscious victim "by a foreign object," in violation of section 289, subdivision (d). (Italics added.)

- <u>Count 5</u>, sexual penetration of the genital opening of an intoxicated person (§ 289, subd. (e)) and <u>count 7</u>, sexual penetration of the anal opening of an intoxicated person (§ 289, subd. (e)). These two counts were newly added and replaced count 20 of the original information, which had alleged sexual penetration of an intoxicated person, in violation of section 289, subdivision (e).

Counts 2 through 7 of the amended information were pled as independent charges. There were no allegations within them indicating the offenses charged were asserted in the alternative to the offenses charged in other counts.

When the trial court received the amended information, it asked the prosecutor to explain the nature of its changes. The prosecutor responded, in part, as follows:

"[T]here are some additional charges that have been added that, ultimately, even if the jury convicted on, we believe would be [section] 654, thereby not increasing the penalty. But it gives the jury alternative theories on which to convict the defendant.

"As we know, many of the victims suffered memory problems as a result of alcohol and-or drugs in this case. And so if the jury can't decide, for example, whether or not a penis went inside of a vagina, then we have added charges of penetration of an unknown object, for example.

"So for the record, specifically the charges that have been added as to victim [Jane 1], we have an addition of unconscious penetration of an unknown object, penetration of an unknown object of an unconscious person, and penetration of an unknown object of an intoxicated person. [¶] . . . [¶]

"So those charges, we believe, would, at sentencing, ultimately be [section] 654, but do provide the jury with additional—additional theories of what happened in these individual cases."

Defense counsel objected to the filing of the amended information on the ground that it was untimely and "penetration of an unknown object" was a "new charge" that was not presented at the preliminary hearing.[11] The

---

[11]   There is a degree of imprecision in the arguments of Dorado's trial counsel. After objecting to the "new charge" of "penetration of an unknown object," she then appeared to object "[t]o [the] add[ition of] new charges, additional charges of rape of an unconscious person." Similar imprecision also appears in Dorado's appellate briefing. In his opening brief on appeal, Dorado alternately argues that we should (1) strike his convictions on counts 4 and 5 or stay his sentence on count 5, or (2) strike his convictions on counts 2 and 3 or stay his sentence on count 3. However, he makes the first argument more frequently. We understand him to be challenging his convictions on counts 4 and 5, and his sentence on count 5, as opposed to his convictions on counts 2 and 3 and sentence on count 3.

trial court responded, "Well, isn't it true that the sexual penetration charge requires an act of sexual penetration with a foreign object or device or unknown object, and didn't we have testimony at the preliminary hearing of trauma to either vaginal or anal openings under circumstances in which the victim may not have known what did the penetration? If that's true, isn't that encompassed within [s]ection 289?" Defense counsel responded, "It may possibly be." Defense counsel asserted, however, that she had just received the amended information and would need time to "look at the testimony as to that." The court overruled the defense objection and arraigned Dorado on the amended information. While arraigning Dorado, the court stated: "The People are representing that there's no increase in exposure on this case."

The jury convicted Dorado of both rape counts and all four counts of unlawful sexual penetration against Jane 1. In their sentencing memorandum, the People argued Dorado should receive separate punishment for his convictions on count 3, rape of an intoxicated person, and count 5, sexual penetration of an intoxicated person. Defense counsel disagreed, and asserted there was no evidence Jane 1 was "raped by a penis and then raped by a finger or a separate object."

On each of counts 2 through 5, the trial court imposed the upper term of eight years. The court stayed the sentence on count 2 pursuant to section 654, on the ground the conviction on this count was based on the same act of sexual intercourse as the conviction on count 3. It likewise stayed the sentence on count 4 on the ground the convictions on counts 4 and 5 were both based on the same act of vaginal penetration. The court declined to stay the sentence on count 5 in favor of the sentence on count 3, reasoning count 5 "involved a separate physical act from [c]ount 3" that constituted "a different

22

way of committing a non-consensual violation of [Jane 1's] body and her person."

B.    *Dorado's Contentions on Appeal*

Before we analyze the merits of Dorado's due process claim, we pause to review what he does and does not contend. Dorado states in his opening brief on appeal that he "does not challenge the trial court's ruling that [the] amendment [adding counts 4 and 5 to the information] was supported by the evidence presented at the preliminary hearing." He also concedes "the trial evidence supported a jury finding of two separate acts of penetration."

His due process claim is that he "was never placed on notice of any intent by the district attorney to prosecute him for two separate acts of penetration." He focuses on the prosecutor's statement during the pretrial hearing that "if the jury can't decide, for example, whether or not a penis went inside of a vagina, then we have added charges of penetration of [sic] an unknown object," and the statement that the prosecutor believed separate punishment on the new charges would be barred by section 654 such that they would not increase his overall exposure.

Dorado claims: "The amendment, *coupled with the People's representation*, placed [him] on notice that the People intended to obtain a conviction for a single act of penetration that was either vaginal intercourse or penetration of [sic] an unknown object. Nothing in the preliminary hearing or charges provided notice that the People might seek to show two distinct acts of vaginal penetration." (Italics added.) He claims he relied on "the notice provided *by the People's representation* that Counts 4 and 5 were charged in the alternative" when he took the stand and admitted an act of digital penetration. (Italics added.) He claims the prosecutor was not "free to obtain verdicts" based on two separate acts of penetration "where [he] never

23

received constitutional notice." He argues the trial court therefore lacked jurisdiction to "treat Counts 4 and 5 as a distinct act from Counts 2 and 3 at sentencing." As remedies for the asserted due process violation, he requests that we either strike his convictions on counts 4 and 5 pursuant to section 954, or stay his sentence on count 5 pursuant to section 654.

C.    *Analysis*

Dorado's due process claim rests in large part on the prosecutor's oral description of the amended information, which he asserts led him to believe the sexual penetration charges in counts 4 and 5 were asserted in the alternative to the rape charges in counts 2 and 3, and thus he stood accused of committing only a single act of vaginal penetration. Constitutional notice, however, is provided by the charging document itself as well as the evidence adduced at the preliminary hearing, not the prosecutor's oral description of the charges. (*People v. Jones* (1990) 51 Cal.3d 294, 317 (*Jones*) ["advance notice [is] provided by the information and preliminary examination"].) As we discuss, the charging documents filed in this case and the evidence adduced at the preliminary hearing provided Dorado with constitutionally sufficient notice that he was being prosecuted for two separate acts of vaginal penetration against Jane 1. As a result, there was no due process violation.

"Article I, section 14 of the California Constitution requires that '[f]elonies shall be prosecuted as provided by law, either by indictment or, after examination and commitment by a magistrate, by information.' This constitutional requirement means a person may not be prosecuted 'in the absence of a prior determination of a magistrate or grand jury that such action is justified.' [Citation.] 'Before any accused person can be called upon to defend himself on any charge prosecuted by information, he is entitled to a preliminary examination upon said charge, and the judgment of the

24

magistrate before whom such examination is held as to whether the crime for which it is sought to prosecute him has been committed, and whether there is sufficient cause to believe him guilty thereof. These proceedings are essential to confer jurisdiction upon the court before whom he is placed on trial.' " (*People v. Calhoun* (2019) 38 Cal.App.5th 275, 303 (*Calhoun*).)

"Once a defendant has been held to answer on the offenses alleged in a complaint, the People must within 15 days file an information alleging the offenses shown by the evidence presented at the preliminary hearing." (*Calhoun, supra,* 38 Cal.App.5th at p. 303.) The trial court may thereafter "permit an amendment of an . . . information . . . for any defect or insufficiency, at any stage of the proceedings . . . unless the substantial rights of the defendant would be prejudiced thereby." (§ 1009.) However, "[a]n indictment or accusation cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination." (*Ibid.*) "Section 1009 preserves a defendant's substantial right to trial on a charge of which he had due notice. [Citation.] In other words, section 1009 protects a defendant's right to due process." (*People v. Pitts* (1990) 223 Cal.App.3d 606, 903–904, superseded by statute on another ground as stated in *People v. Levesque* (1995) 35 Cal.App.4th 530, 537.)

"Due process of law requires that an accused be advised of the charges against him so that he has a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial." (*Jones, supra,* 51 Cal.3d at p. 317.) "In this context, the information ' "tells a defendant *what kinds of offenses* he is charged with and states the number of offenses that can result in prosecution." ' [Citation.] By contrast, the preliminary hearing transcript 'afford[s the defendant] notice of the time,

place and circumstances of [*the*] *charged offenses*' in the information." (*People v. Sorden* (2021) 65 Cal.App.5th 582, 605 (*Sorden*).) " '[A]n information which charges the commission of an offense not named in the commitment order will not be upheld unless (1) the evidence before the magistrate shows that such offense was committed [citation], and (2) that the offense "arose out of the transaction which was the basis for the commitment" on a related offense.' " (*Calhoun, supra*, 38 Cal.App.5th at p. 303, quoting *Jones v. Superior Court* (1971) 4 Cal.3d 660, 664–665.) " '[A]t a minimum, a defendant must be prepared to defend against all offenses of the kind alleged in the information as are shown by evidence at the preliminary hearing to have occurred within the timeframe pleaded in the information.' " (*Jones*, at p. 317.)

At all relevant times in the prosecution of this case, Dorado was separately charged with rape of Jane 1 in violation of section 261, subdivisions (a)(3) and (4), and sexual penetration of Jane 1 in violation of section 289, subdivisions (d) and (e). Rape requires an act of "sexual intercourse." (§ 261, subd. (a).) "*Sexual intercourse*," in the context of rape, means "any penetration, no matter how slight, *of the vagina or genitalia by the penis*." (CALCRIM Nos. 1002, 1003, second italics added; see *People v. Stitely* (2005) 35 Cal.4th 514, 554; *People v. Holt* (1997) 15 Cal.4th 619, 676 (*Holt*).)

" 'Sexual penetration' " is defined by section 289 as "penetration . . . of the genital or anal opening . . . by any foreign object, substance, instrument, or device, or by any unknown object." (§ 289, subd. (k)(1).) " 'Foreign object' " includes "any part of the body, *except a sexual organ*." (§ 289, subd. (k)(2), italics added.) " 'Unknown object' " is defined to include "any foreign object, substance, instrument, or device, or any part of the body, including a penis,

26

when it is not known whether penetration was by a penis or by a foreign object, substance, instrument, or device, or by any other part of the body." (§ 289, subd. (k)(3).)

Dorado was charged in counts 21 and 22 of the second amended complaint with two counts of rape of Jane 1: rape of an unconscious person (§ 261, subd. (a)(4)) and rape of an intoxicated person (§ 261, subd. (a)(3)). Since rape can only mean penile penetration of the vagina, these charges effectively alleged that Dorado penetrated Jane 1's vagina with his penis.

Dorado was also charged in count 23 of the second amended complaint with sexual penetration of an unconscious person, and specifically with penetrating Jane 1's genital *and* anal openings with "a foreign object." (§ 289, subd. (d).) Since a foreign object does not include a sexual organ, this count in effect charged Dorado with penetrating Jane 1's vagina[12] and anus with something other than his penis. By charging both forms of penetration in the conjunctive, count 23 put Dorado on notice he was accused of committing both acts of penetration, vaginal and anal. "When a statute . . . lists several acts in the disjunctive, any one of which constitutes an offense, the complaint, in alleging more than one of such acts, should do so in the conjunctive to avoid uncertainty." (*In re Bushman* (1970) 1 Cal.3d 767, 775, disapproved on another ground in *People v. Lent* (1975) 15 Cal.3d 481, 486, fn. 1.) "[B]y pleading the statute in the conjunctive, [the prosecution] puts the defendant on notice that he may face conviction under either theory."

---

[12]  We recognize penetration of the genital opening is not synonymous with penetration of the vagina. (See, e.g., *People v. Quintana* (2001) 89 Cal.App.4th 1362, 1367 ["[t]he vagina is only one part of the female genitalia, which also include inter alia the labia majora, labia minora, and the clitoris"].) But here, the parties agree Jane 1's injuries, and the penetrative act or acts that caused them, were vaginal.

27

(*People v. Smith* (2013) 57 Cal.4th 232, 248 (conc. opn. of Corrigan, J.).) Thus, count 23 placed Dorado on notice he was alleged to have penetrated Jane 1's vagina as well as her anus with an instrument other than his penis.[13]

Count 24 generically alleged Dorado committed "an act of sexual penetration of [Jane 1]" without specifying an orifice or instrument of penetration. As such, count 24 encompassed all acts of penetration proscribed by section 289, subdivision (k)(1). Thus, the operative pleading at the time of the preliminary hearing charged Dorado with different sex offenses based on acts of penile penetration of Jane 1's vagina and non-penile penetration of Jane 1's vagina and anus. Since a single act of vaginal penetration cannot simultaneously be committed with a penis and with something other than a penis, the allegations of the second amended felony complaint served to notify Dorado he was accused of two distinct acts of vaginal penetration of Jane 1.

As we have noted, at the conclusion of the preliminary hearing, the magistrate issued a commitment order holding Dorado to answer to the charges in counts 21 through 24 of the second amended complaint. Dorado nevertheless contends "[n]othing in the preliminary hearing . . . provided notice that the People might seek to show two distinct acts of vaginal penetration." He does not explain this assertion, and we disagree with it.

---

[13] Because count 23 alleged vaginal penetration and anal penetration, proof Dorado committed either act of penetration would (together with proof of the other offense elements) suffice to convict him of the charges in count 23. (*People v. Fritz* (1970) 11 Cal.App.3d 523, 526.) Even so, the express allegation in count 23 that Dorado penetrated Jane 1's genital opening with a foreign object placed him on notice he was accused of committing such an act.

The purpose of the preliminary hearing is to establish whether there is probable cause to believe the defendant is guilty of the felonies charged in the complaint. (§ 866, subd. (b); see § 872, subd. (a).) The probable cause determination can rest on inferences. (*People v. Superior Court* (*Lujan*) (1999) 73 Cal.App.4th 1123, 1127.) Moreover, proof of penetration can be based on circumstantial evidence. (*People v. Peters* (1957) 149 Cal.App.2d 94, 97; see *Holt*, *supra*, 15 Cal.4th at p. 669 ["The jury verdict in this case was not, as defendant argues, based only on speculation. It was based on evidence that the redness present in the victim's vagina was consistent with penetration by an adult male penis."].)

The evidence presented at the preliminary hearing supported inferences of more than one distinct act of vaginal penetration of Jane 1, as alleged in the second amended complaint. Because Jane 1 had no memory of the sexual assault, determining what acts of vaginal penetration had occurred was a matter of discerning the inferences that could be drawn from the blood in the toilet bowl, the injuries to her hymen and cervix discovered during the SART exam, the discovery of Dorado's semen on her bra and underwear, and the absence of semen in her vagina. In discussing this evidence, defense counsel acknowledged Jane 1's vaginal trauma was consistent with penetration by a finger or other object, but disputed that it supported an inference of penile penetration.

The magistrate found the injury to the cervix, which the prosecutor argued was too deep to be caused by a finger, supported a probable cause finding that the object inserted was a penis and there had been sexual intercourse. This was a logical inference supported by the evidence. While the magistrate did not expressly discuss the evidence supporting the charge of sexual penetration of "the genital and anal openings" of an unconscious

29

victim "by a foreign object," the presence of a second, shallower vaginal injury, together with the other forensic evidence, supported the inference *proposed by the defense* that a finger or object other than Dorado's penis was inserted in Jane 1's vagina. While Dorado disputes whether the preliminary hearing evidence supported the inference he committed more than one act of vaginal penetration, the presence of more than one vaginal injury reasonably supported the inference of more than one penetrative act by more than one penetrative instrument. Even if the preliminary hearing evidence, being circumstantial, could not confirm whether the penetration was penile, non-penile, or both, it was sufficient to put Dorado on notice of the need to be prepared to defend both forms of penetration. (*Jones*, *supra*, 51 Cal.3d at p. 317.) By alleging in the operative complaint (as well as the ensuing felony information) that Dorado both raped Jane 1 and sexually penetrated Jane 1's genital opening with a foreign object, the prosecution signaled its position Dorado committed two separate acts of vaginal penetration of Jane 1.

In the information, the prosecution realleged verbatim the same rape and unlawful sexual penetration counts that were alleged in the second amended complaint, renumbering them as counts 17 through 20.[14] Thus, the information, like the second amended complaint, accused Dorado of penile penetration of Jane 1's vagina (by virtue of the rape counts); non-penile penetration of Jane 1's vagina and anus (by virtue of the sexual

---

[14] The information charged Dorado with rape of an unconscious person (count 17; § 261, subd. (a)(4)), rape of an intoxicated person (count 18; § 261, subd. (a)(3)), sexual penetration of an unconscious person (count 19; § 289, subd. (d)), and sexual penetration of an intoxicated person (count 20; § 289, subd. (e)). Count 19 of the information, like count 23 of the second amended complaint, specifically alleged penetration of Jane 1's genital and anal openings by a foreign object.

penetration with a foreign object counts); and penile and non-penile penetration of her vagina and anus (by virtue of the generic sexual penetration count). He was not charged in a single count with committing one act of vaginal penetration or the other; he was charged in multiple independent counts that would support separate convictions if the jury determined he committed both forms of vaginal penetration.

The amended information, like the information, charged Dorado with two counts of rape (count 2, rape of an unconscious person, § 261, subd. (a)(4)); and count 3, rape of an intoxicated person, § 261, subd. (a)(3)). Thus, Dorado was still accused of penetrating Jane 1's vagina with his penis. Count 4 charged him with sexual penetration of Jane 1's genital opening with an unknown object in violation of section 289, subdivision (d), and count 5 charged him with sexual penetration of Jane 1's genital opening in violation of section 289, subdivision (e), without specifying whether the penetration was by an unknown object or foreign object. Counts 2, 3, 4, and 5 thus placed Dorado on notice he could be convicted of violating separate Penal Code violations based on separate acts of vaginal penetration if the jury determined that he committed, in addition to the other offense elements, the sex acts charged in each count (i.e., penetration of Jane 1's vagina with his penis and penetration of her vagina with an unknown object). Although Dorado contends these counts were "alternative" charges, nothing about the amended information reveals this to be so. Counts 2 through 5 were independent counts. Nothing in their supporting allegations indicated the offenses in these counts were being charged in the alternative to the offenses alleged in any other counts.

Dorado's claim that counts 4 and 5 were alleged in the alternative to the charges in counts 2 and 3 appears to stem from the prosecutor's oral

31

statements during the pretrial hearing. Describing the added charges as "additional" or "alternative" theories, the prosecutor stated that "if the jury can't decide, for example, whether or not a penis went inside of a vagina, then we have added charges of penetration of [sic] an unknown object." At the time the prosecutor made these statements, defense counsel was in possession of the amended information.[15] Defense counsel had an independent obligation to examine and evaluate "the charges, applicable law, and evidence, and of the risks and probable outcome of trial." (*In re Alvernaz* (1992) 2 Cal.4th 924, 933.) Any confusion over the manner in which the new counts were charged could have been resolved by examining the amended information.

Dorado's claim that he lacked notice of the potential sentencing consequences of the charges in the amended information derives from the prosecutor's oral assertion that the People "believe[d]" the new charges "would, at sentencing, ultimately be [section] 654." Although this statement proved to be inaccurate, we are not persuaded Dorado's due process rights were violated. The prosecutor was not making a sentencing promise as part of a plea bargain. (Cf. *The Assn. of Deputy Dist. Attorneys etc. v. Gascon* (2022) 79 Cal.App.5th 503, 553 [prosecutors have discretion in deciding what arguments to present in seeking leave to amend a charging document]; *People v. Clark* (1992) 7 Cal.App.4th 1041, 1047 [the requirements of due process attach to implementation of a plea bargain, such that violation of the bargain by the prosecution raises a constitutional right to a remedy].) Dorado does not contend, and we do not perceive, that the prosecutor made the statement

_____

15      Dorado was represented at the pretrial hearing and at trial by two retained defense attorneys.

in bad faith.  Whether any convictions on counts 4 and 5 would be treated as though they were based on separate acts from any convictions on counts 2 or 3 was ultimately a matter for the sentencing judge to decide, after it receives evidence from the trial.  (See *People v. Ross* (1988) 201 Cal.App.3d 1232, 1240 ["The factual questions that are involved in determining the applicability of [section 654] . . . in the vast majority of cases [are] resolved by the sentencing judge on the basis of the evidence received during trial."].)  The potential sentencing consequences to Dorado if the jury determined he committed acts of penile and non-penile vaginal penetration were discernible from the charges in the amended information.  (See, e.g., *People v. Pearson* (2012) 53 Cal.4th 306, 333 [section 654 does not preclude separate punishment for separate acts of sexual penetration committed during a single encounter].)  The trial court, in deciding whether to exercise its discretion to grant the amendment, relied on the preliminary hearing evidence, not the prosecution's sentencing prediction.

We are also not persuaded by Dorado's claim that he suffered prejudice because he admitted digital penetration of Jane 1 in the belief the prosecution charged the added sexual penetration counts in the amended information in the alternative to the rape counts.  First, Dorado's defense was that his sexual contact with all his victims, including Jane 1, was consensual, a defense that was not impaired by the amendment.  Second, "[n]otice is supplied in the first instance by the accusatory pleading." (*People v. Hoyt* (2020) 8 Cal.5th 892, 923.)  To the extent admitting penetration of Jane 1's vagina with an instrument other than his penis carried risks, the amended information showed the sexual penetration charges were asserted independently, not alternatively, making it possible for the defense to anticipate those risks.  Third, the pretrial hearing, and the filing of the

33

amended information, took place on November 12, 2019. Dorado did not take the stand to testify until December 11, nearly 30 days later. If examination of the amended information left the defense with doubts about the basis for the charges or their effect on Dorado's defense, it had time not only to evaluate the charges in the amended information, but to respond to its filing by requesting a trial continuance (§ 1009), demurring to its allegations if it found them uncertain (§ 1004; see *Jones, supra,* 51 Cal.3d at p. 312 [the " 'defendant may demur if he or she believes the lack of greater specificity hampers the ability to defend against the charges' "]), or demanding an election (*People v. Salvato* (1991) 234 Cal.App.3d 872, 882). None of these steps were taken.

Further undermining Dorado's claims that he relied to his detriment on the prosecutor's statements at the pretrial hearing, the record is devoid of any indication the defense harbored the view that counts 2 through 5 were asserted in the alternative, or that Dorado could not be convicted and sentenced on all four counts. Although Dorado complains on appeal that the prosecutor's rebuttal evidence increased the likelihood the jury would conclude he committed two separate and distinct acts of vaginal penetration of Jane 1, the defense did not object on this ground when the rebuttal evidence was introduced. The failure to object to this evidence forfeits any contention that its admission violated Dorado's due process rights. (*Sorden, supra,* 65 Cal.App.5th at p. 606 ["[A] defendant who fails to object at trial that the evidence showed offenses different from those at the preliminary hearing forfeits appellate consideration of the contention that the defendant lacked adequate notice of the charges."].) Further still, the prosecutor told the jury in closing argument, "the sex acts that we're talking about [with regard to Jane 1] are going to be sexual intercourse, sexual penetration of her

vagina, *and* sexual penetration of her anus," and argued "*all of* [Jane 1's] charges have been proved." (Italics added). These arguments drew no objection from the defense. Nor did defense counsel tell the jury the charges of rape and sexual penetration of Jane 1's vagina were alternative charges, or that the jury could only return guilty verdicts on the rape counts or vaginal sexual penetration counts, but not both.[16] At sentencing, the defense did not claim it was deprived of notice Dorado could be convicted of, and separately sentenced for, the rape and sexual penetration offenses charged in counts 2 through 5. Dorado's failure to raise in the trial court any of the positions he now asserts on appeal undermines his claims. "A defendant may not speculate on the result of a sentencing hearing and then, in the face of an unfavorable result, seize upon theoretical uncertainty in the accusatory

---

[16] At oral argument, Dorado for the first time presented a developed argument that the absence of a unanimity instruction supports the conclusion the jury's convictions on counts 2 through 5 were improperly based on the same act. His failure to raise this point sooner forfeits the contention. (*People v. Thompson* (2010) 49 Cal.4th 79, 110, fn. 13 [improper to raise an argument for the first time at oral argument]; *In re J.G.* (2008) 159 Cal.App.4th 1056, 1068 [same].) Even if we were to consider the belated argument, we would reject it. Dorado raised the point as a means of likening this case to *People v. Aguayo* (2022) 13 Cal.5th 974 (*Aguayo*). But as we later discuss in footnote 20, this case is not governed by *Aguayo*. Moreover, a unanimity instruction is required where " 'a single count [is] . . . based on two or more discrete criminal events.' " (*People v. Russo* (2001) 25 Cal.4th 1124, 1135.) To find Dorado guilty of rape in violation of counts 2 and 3 of the amended information, the jury was required to find Dorado penetrated Jane 1's vagina with his penis. A finding Jane 1 was penetrated by a penis would exclude the finding required to convict Dorado of the unlawful sexual penetration offenses in counts 4 and 5, because the same penetrative instrument cannot simultaneously be a penis and an unknown object. A unanimity instruction was therefore not required to ensure the jury's convictions on counts 2 and 3 were not based on the same act of vaginal penetration as the convictions on counts 4 and 5.

pleading to lessen his sentence on appeal." (*People v. Ramirez* (2003) 109 Cal.App.4th 992, 998.)

This case is unlike *People v. Burnett* (1999) 71 Cal.App.4th 151, *People v. Graff* (2009) 170 Cal.App.4th 345 (*Graff*), and *People v. Dominguez* (2008) 166 Cal.App.4th 858 (*Dominguez*), on which Dorado relies. In *Burnett*, the information charged the defendant with being a felon in possession of a firearm, and specifically alleged possession of a .38-caliber revolver. (*Burnett*, at p. 156.) At trial, the prosecution presented evidence the defendant possessed a .357-caliber revolver during a different incident that was not shown by the evidence at the preliminary hearing. (*Id.* at p. 167.) The trial court improperly permitted the information to be amended to strike the words " '.38 caliber,' " allowing the defendant to be convicted of the possession offense based on the other incident involving possession of a .357-caliber revolver that was not the subject of the preliminary hearing. (*Id.* at pp. 167–171.) That is not this case. Here, there was no change in the charging document that impermissibly allowed a conviction based on an incident that was not the subject of the preliminary hearing. Instead, the evidence, and the new charges in the amended information, arose from the same December 23, 2009 encounter in which Dorado sexually assaulted Jane 1, causing her to suffer the vaginal trauma described by the evidence at the preliminary hearing.

In *Graff*, the defendant was wrongly convicted of lewd act offenses the magistrate dismissed for insufficient proof at the preliminary hearing, and which were never charged in the information. (See *Graff, supra,* 170 Cal.App.4th at pp. 360–368.) In *Dominguez*, the defendant was charged with one count of unauthorized use of a motor vehicle. (*Dominguez, supra,* 166 Cal.App.4th at p. 861.) At the preliminary hearing, the prosecution

36

presented evidence of a single unauthorized use, but at trial, the prosecution presented evidence of an additional unauthorized use on a different date. (*Id.* at pp. 861–862.) After the close of evidence, the trial court erroneously permitted amendment of the information to extend the date range of the charge, allowing the jury to convict the defendant based on the second incident that was not the subject of the preliminary hearing. (*Id.* at pp. 862, 866.)

Here, the procedural scenarios that created constitutional error in *Graff* and *Dominguez* are simply not present. Dorado was not convicted of an offense that was dismissed by the magistrate, or of an offense that was based on an incident transactionally unrelated to the incident that was the subject of the preliminary hearing. Instead, Dorado's convictions on counts 2 through 5 arose from the same incident and offenses that were proven at the preliminary hearing.

In sum, the preliminary hearing evidence, together with the charging documents filed in this case, provided Dorado with notice he was accused of more than one distinct act of vaginal penetration of Jane 1, and that he could be separately convicted and sentenced if the jury determined he committed the sex offenses alleged in counts 2 through 5 of the amended information. Dorado received his constitutionally required notice of the factual basis of counts 4 and 5 of the amended information, and the prosecutor's oral description of those charges did not alter that circumstance. We therefore conclude no due process violation occurred here. Because we find no due process violation, we need not consider Dorado's proposed remedies for the violation.[17]

_____

[17] In a letter submitted to this court on September 7, 2022, Dorado cited *Aguayo*, *supra*, 13 Cal.5th 974, a recent decision issued by the California

37

II.

*Assault With Intent to Commit Rape, Oral Copulation, or Sexual Penetration*

*of an Unconscious or Intoxicated Person Is Not a Lesser Included Offense of*

*Rape, Oral Copulation, or Sexual Penetration of an Unconscious or*

*Intoxicated Person*

As to all four victims, Dorado was convicted of assault with the intent
to commit rape, sexual penetration, or oral copulation of an unconscious or
intoxicated person (counts 1, 12, 28, and 31; § 220, subd. (a)(1)), in addition to
being convicted of rape (§ 261, subds. (a)(3), (4)), unlawful sexual penetration
(§ 289, subds. (d), (e)) and/or oral copulation of an intoxicated or unconscious

Supreme Court after Dorado filed his reply brief on appeal. In *Aguayo*, our
high court held that assault with a deadly weapon (§ 245, subd. (a)(1)) and
assault by means of force likely to cause great bodily injury (§ 245, subd.
(a)(4)) are " 'different statements of the same offense' " for purposes of section
954. (*Aguayo*, at pp. 981–993.) It further held the People could not overcome
the problem created by the defendant's dual convictions of both assault
offenses by demonstrating that the convictions were based on separate acts,
because the jury was never asked to make such a determination. (*Id.* at
pp. 993–995.) For several reasons, *Aguayo* is distinguishable. First, unlike
the defendant in *Aguayo*, Dorado is claiming a due process violation, not a
violation of section 954. Second, this case involves different offenses than the
assault offenses at issue in *Aguayo*. Dorado has not attempted to establish
that rape and unlawful sexual penetration are, by virtue of the relevant
statutory text and legislative history, the same offense for purposes of section
954. (Cf. *Aguayo*, at pp. 981–988; see *People v. Gonzalez* (2014) 60 Cal.4th
533, 537, 538–540 [oral copulation of intoxicated person and oral copulation
of unconscious person are different offenses]; *People v. White* (2017) 2 Cal.5th
349, 354–359 [rape of intoxicated person and rape of unconscious person are
different offenses].) Third, to the extent Dorado relies on section 954, he does
it in an unusual way: he invokes it to guide our selection of a remedy for the
due process violation. Since we conclude there was no due process violation,
we do not reach Dorado's argument that section 954 governs our selection of a
remedy for the violation. For these reasons, *Aguayo* does not control our
disposition of this case.

38

person (former § 288a, subds. (f), (i), now § 287, subds. (f), (i)).  Dorado contends we must reverse his convictions on counts 1, 12, 28, and 31 because assault with intent to commit any of the foregoing sex offenses is a lesser included offense of the completed sex offense.  We disagree.

"In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct.  'In California, a single act or course of conduct by a defendant can lead to convictions "of *any number* of the offenses charged." ' " (*People v. Reed* (2006) 38 Cal.4th 1224, 1226 (*Reed*).)  However, "[a] judicially created exception to the general rule permitting multiple conviction 'prohibits multiple convictions based on necessarily included offenses.' " (*Id*. at p. 1227.)  " '[I]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.' " (*Ibid*.)  When a defendant is convicted of both the greater and the lesser offense, the trial court must strike the conviction of the lesser offense.  (*People v. Medina* (2007) 41 Cal.4th 685, 702.)  This is because " '[t]o permit conviction of both the greater and the lesser offense " ' "would be to convict twice of the lesser." ' " ' " (*Ibid*.)

The California Supreme Court has "applied two tests in determining whether an uncharged offense is necessarily included within a charged offense:  the 'elements' test and the 'accusatory pleading' test.  Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former.  Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former." (*Reed*, *supra*, 38 Cal.4th at pp. 1227–1228.)  "Courts should consider the statutory elements

and accusatory pleading in deciding whether a defendant received notice, and therefore may be convicted, of an *uncharged* crime, but only the statutory elements in deciding whether a defendant may be convicted of multiple *charged* crimes." (*Id.* at p. 1231.)

Here, an examination of the elements of the crimes reveals that rape, sexual penetration, or oral copulation of an unconscious or intoxicated person can be committed without necessarily committing assault with the intent to commit rape, sexual penetration, or oral copulation of an unconscious or intoxicated person in violation of section 220, subdivision (a)(1).

Rape in violation of section 261 requires an act of sexual intercourse. (§ 261, subd. (a); *Holt, supra,* 15 Cal.4th at pp. 675–676.) "Any sexual penetration, however slight, is sufficient to complete the crime" of rape. (§ 263.) Section 289 requires an act of " '[s]exual penetration,' " statutorily defined as "the act of causing the penetration, however slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object." (§ 289, subd. (k)(1).) Thus, section 289 is violated if the defendant penetrates or causes another person to penetrate the defendant's or another person's genital or anal opening. Former section 288a requires an act of oral copulation, which "is the act of copulating the mouth of one person with the sexual organ or anus of another person." (Former § 288a, subd. (a), current § 287, subd. (a).)

Rape, oral copulation, and sexual penetration of an intoxicated person all involve the commission of the foregoing acts of penetration or oral copulation on a victim who is prevented from resisting by an intoxicating, anesthetic, or controlled substance. (§§ 261, subd. (a)(3), former 288a, subd.

(i), now 287, subd. (i), 289, subd. (e).) Similarly, rape, oral copulation, and sexual penetration of an intoxicated person all involve the commission of the foregoing acts of penetration or oral copulation on a victim who is "unconscious of the nature of the act" and is therefore incapable of resisting. (§§ 261, subd. (a)(4), former 288a, subd. (f), now 287, subd. (f), 289, subd. (d).) Rape, oral copulation, and sexual penetration of an unconscious or intoxicated person thus require only one physical act: the prohibited act of sexual penetration or oral copulation.

Section 220, subdivision (a)(1), on the other hand, is violated when any person "assaults another with intent to commit mayhem, rape, sodomy, oral copulation, or any violation of Section 264.1, 288, or 289[.]" Assault is statutorily defined as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) "[T]he 'mens rea [for assault] is established upon proof the defendant willfully committed an act that by its nature will probably and directly result in injury to another, i.e., a battery.' " (*People v. Williams* (2001) 26 Cal.4th 779, 782 (*Williams*).) Although section 240 speaks of a "violent injury," an "assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another" (*Williams,* at p. 790). In addition to an assault, section 220 also requires an intent to commit one of the specified crimes. " 'An assault with intent to commit rape is a form of attempted rape.' [Citations.] It is an 'aggravated form' of that offense because it is a combination of the elements of attempted rape and assault." (*People v. Pierce* (2002) 104 Cal.App.4th 893, 898 (*Pierce*).)

Dorado, relying on *People v. Miranda* (2021) 62 Cal.App.5th 162, 174 (*Miranda*), review granted June 16, 2021, S268384, argues it is impossible to

commit the crimes of rape, oral copulation, or sexual penetration of an intoxicated or unconscious person without committing a battery, and that assault with intent to commit these sex offenses is, therefore, necessarily included in the completed sex offenses.  Not so.  In *Miranda*, the Court of Appeal held that battery (§ 242) is a lesser included offense of the crimes of rape, oral copulation, and sexual penetration of an unconscious person. (*Miranda*, at p. 174.)  The court observed that " '[a]ny harmful or offensive touching' " constitutes a battery.  (*Id.* at p. 174, quoting *People v. Shockley* (2013) 58 Cal.4th 400, 404.)  It reasoned that a sexual act committed on an unconscious person is inherently a harmful and offensive touching, and therefore a battery.  (*Miranda*, at pp. 173–174.)  It concluded a person cannot commit rape, oral copulation, or sexual penetration of an unconscious person without also committing a battery, making battery a lesser included offense of these crimes.  (*Id.* at p. 175.)

*Miranda* does not assist Dorado, because Dorado was not convicted of simple battery (§ 242), or even simple assault (§ 240).  He was convicted of assault "*with*" intent to commit rape, oral copulation, or sexual penetration of an intoxicated or unconscious person.  (§ 220, subd. (a)(1), italics added.)  The only physical act required to complete the crimes of rape, oral copulation, or sexual penetration of an intoxicated or unconscious person is the act of sexual penetration or oral copulation itself.  A perpetrator who intends to commit acts of sexual penetration or oral copulation of his intoxicated or unconscious victim intends to commit rape, oral copulation, or sexual penetration.  Section 220 adds to this the requirement of an assault.  "The only additional element of assault with intent to commit rape is the perpetrator's subjective intent, during the commission of the assault, to commit a rape."  (*People v. Cook* (2017) 8 Cal.App.5th 309, 313.)  The word "with" in section 220 (assault

42

"with" intent to commit rape, etc.) indicates the assault must involve an intent to commit an act of physical force *other than* the sexual act that comprises the rape, oral copulation, or sexual penetration. (See *United States v. Bolanos-Hernandez* (9th Cir. 2007) 492 F.3d 1140, 1147 [observing that the force required to violate section 220 "appears to be in addition to that required to complete intercourse or penetration" and that the court had "located no case in which a defendant was convicted of assault with intent to commit rape without conduct involving the application of force above and beyond the force inherent to the threatened act of penetration"].) If the "assault" requirement of section 220 was interpreted to refer to the intent to commit the same touching as the sexual touching required to commit the rape, oral copulation, or sexual penetration, it would have no independent meaning; the parts of the statute before and after the word "*with*" would both be satisfied by an intent to commit the same act. We must avoid interpreting a statute in a manner that renders one of its parts "meaningless or inoperative." (*Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257, 274.)

*People v. Leal* (2009) 180 Cal.App.4th 782 is instructive. In *Leal*, our colleagues in the Second District held that rape by artifice, pretense or concealment under section 261, subdivision (a)(5), and sexual penetration by artifice, pretense or concealment under section 289, subdivision (f), were not necessarily included in an assault with intent to commit either of those crimes. (*Leal*, at pp. 792–793.) The court explained that an essential element of assault is the intent to use force against the victim, whereas both rape and sexual penetration by artifice, pretense or concealment "are accomplished *without* force, in that the perpetrator induces the victim to submit to the sexual contact by pretending to be her spouse." (*Id.* at p. 793.)

43

Rape, oral copulation, and sexual penetration of an intoxicated or unconscious person can similarly be committed without force (that is, without the use of additional force beyond the physical act of sexual penetration or oral copulation itself), in that the victim is prevented from resisting due to her intoxication or unconsciousness. Accordingly, assault with intent to commit these sex crimes is not a lesser included offense of the completed sex crimes.

The facts of this case illustrate this point. The evidence at trial established that Dorado committed the acts of sexual penetration and oral copulation against all four victims, acts that were proscribed by the various sex offenses of which he was convicted. But he also used physical force in other ways that were harmful or offensive to his victims. Jane 1 sustained bruises to her hip, arm and breast. Jane 2 sustained injuries to her breast. Jane 4 sustained pain to her neck and breasts, and also had bruises to her breasts. Jane 3 testified that Dorado was sexually aggressive and had a propensity to bite her breasts, supporting the inference he intended to use physical force beyond the force necessary to complete the act of sexual penetration required to violate section 261, subdivisions (a)(3) and (4). The totality of this evidence supports the inference Dorado did commit, and therefore intended to commit, additional batteries against each of the four victims, unrelated to the acts of sexual penetration or oral copulation prohibited by sections 261, subdivisions (a)(3) and (4), 289, subdivisions (d) and (e) and former 288a, subdivisions (f) and (i), now 287, subdivisions (f) and (i).

The People, in their effort to show that a violation of section 220 is not necessarily included in the crimes of rape, oral copulation, or sexual penetration of an intoxicated or unconscious person, argue that the level of

force required under section 220 is "whatever force may be required to overcome the victim's resistance." They cite *People v. Davis* (1995) 10 Cal.4th 463, 509 for this proposition. But *Davis* is inapposite to this case because it involved a conviction of assault with intent to commit *forcible* rape. (See *id*. at p. 487, citing §§ 220, 261, former subd. (2); see also *id*. at p. 509 [defendant characterized the interaction as nothing more than " 'an overly forcible seduction' "].) To accomplish rape by force, one must use enough physical force to overcome the victim's will. (*People v. Griffin* (2004) 33 Cal.4th 1015, 1023–1024; see CALCRIM No. 1000.) Thus, to intend to commit forcible rape, one must intend to use this level of force. By contrast, the offenses of rape, oral copulation, or sexual penetration of an intoxicated or unconscious person are not forcible and do not require use of physical force sufficient to overcome the victim's will. It follows that the level of force necessary for assault with intent to commit such a nonforcible sex offense is the level of force ordinarily required to commit an assault—an act that "by its nature will probably and directly result in the application of physical force against another." (*Williams*, *supra*, 26 Cal.4th at p. 790.) We therefore reject the People's position that the assault crime of which Dorado was convicted required proof of an intent to use this level of force.[18]

In sum, we reject Dorado's position that the "assault[ ]" under section 220, subdivision (a)(1), refers to an intent to commit the same touching as the sexual touching required to commit rape, oral copulation, or sexual

---

[18]    In a supplemental brief, Dorado argues that if we agree with the People that section 220 requires the intent to use force sufficient to overcome the victim's will, his conviction is tainted by instructional error because the jury was not instructed on this requirement. Because we disagree with the People on this point, we conclude there was no such instructional error.

45

penetration of an intoxicated or unconscious person. Instead, we construe the assault requirement as referring to another intended use of physical force against the victim, a use of force not encompassed within the elements of the sex offenses themselves. Thus, sections 261, subdivision (a)(3) and (4), 289, subdivisions (d) and (e), and former 288a, subdivisions (f) and (i), now 287, subdivisions (f) and (i), can be violated without also violating section 220, subdivision (a)(1).

We conclude assault with the intent to commit rape, sexual penetration, or oral copulation of an unconscious or intoxicated person is not a lesser included offense of the crimes of rape, sexual penetration, or oral copulation of an unconscious or intoxicated person. We therefore affirm Dorado's convictions on counts 1, 12, 28, and 31.

## III.

*Dorado's Constitutional Rights Are Not Violated By His Classification as a Violent Felon Under Section 667.5, Subdivision (c)(15)*

Dorado's next challenge relates to the reduced rate at which he accrues conduct credits. Under section 2933.1, if the defendant is convicted of a violent felony listed in section 667.5, subdivision (c), and is sentenced to state prison, his pre-sentence and post-sentence conduct credits are limited to 15 percent. (§ 2933.1, subds. (a), (c); see *People v. Valenti* (2016) 243 Cal.App.4th 1140, 1184, superseded by statute on other grounds as stated in *People v. Brooks* (2018) 23 Cal.App.5th 932, 946, fn. 17.) Assault with intent to commit a specified felony in violation of section 220 is one of the violent felonies listed in section 667.5, subdivision (c). (§ 667.5, subd. (c)(15).) However, the other felonies of which Dorado was convicted (§§ 261, subd. (a)(3), (4), 289, subds. (d), (e), & former 288a, subds. (f), (i), now 287, subds. (f), (i)) are not listed in section 667.5, subdivision (c). The 15-percent cap on

46

accrual of conduct credits nevertheless applies to him. " '[B]y its terms, section 2933.1 applies to the offender not to the offense and so limits a violent felon's conduct credits irrespective of whether or not all his or her offenses come within section 667.5.' " (*People v. Palacios* (1997) 56 Cal.App.4th 252, 256.)

Dorado claims that classifying him as a violent felon under section 667.5 based on his convictions pursuant to section 220, subdivision (a)(1), violates his federal constitutional rights to equal protection and substantive due process of law. For equal protection purposes, the comparison he draws is between (1) a person who commits assault with intent to commit rape, oral copulation, or sexual penetration of an intoxicated or unconscious person in violation of section 220, and (2) a person who commits rape, oral copulation, or sexual penetration of an intoxicated or unconscious person. He claims the same conduct violates section 220 and the statutes that penalize rape, oral copulation, or sexual penetration of an intoxicated or unconscious person. He claims both groups are therefore similarly situated, and he is no more culpable than a person who is only convicted of rape, oral copulation, or sexual penetration of intoxicated or unconscious persons. He claims the legislative decision to restrict the issuance of conduct credits to the first group but not the second group is therefore irrational and violates his rights to equal protection and substantive due process of law. We disagree.

" 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' " (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.) "This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' " (*Ibid*.) " 'If

47

persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold.' " (*People v. Diggs* (2022) 80 Cal.App.5th 702, 710.)

Dorado's equal protection challenge fails to make it past this initial step. The flaw in his claim is that it rests on a premise we have already rejected. In Dorado's own words, his core contention is this: "Appellant contends only that it is unconstitutional to penalize *an attempt* more harshly than the completed crime where the attempt does not require any additional conduct or more culpable mens rea than the completed crime." But as we have already discussed, section 220, subdivision (a)(1), requires more than just an attempt to commit rape, oral copulation, or sexual penetration of an intoxicated or unconscious person. It adds to this requirement the requirement of an assault. " 'An assault with intent to commit rape is a form of attempted rape. [Citations.]' It is an 'aggravated form' of that offense because it is a combination of the elements of attempted rape and assault." (*Pierce, supra*, 104 Cal.App.4th at p. 898.) Where the intended sex offense is a nonforcible sex offense such as rape, oral copulation, or sexual penetration of an intoxicated or unconscious person, where only one physical act is required to commit the crime (the proscribed act of sexual penetration or oral copulation), the addition of the assault adds an intended act of force not embraced by the sex offenses themselves. Contrary to Dorado's contentions, a person convicted of violating section 220, subdivision (a)(1), is not equally as culpable as a person who is only convicted of rape, oral copulation, or sexual penetration of intoxicated or unconscious persons.

Dorado's substantive due process claim rests on the same flawed premise. He argues "it is fundamentally unfair to punish a conviction for an attempt to commit a crime more harshly than the completed crime itself."

Again, section 220 requires more than just an attempt to commit rape, oral copulation, or sexual penetration of an intoxicated or unconscious person: it also requires an assault. And we do not interpret the assault requirement in section 220 to refer to the same threatened touching as the sexual touching proscribed by the provisions that penalize these sex offenses.

Because Dorado's constitutional challenge fails at the threshold showing, we reject his claim that his rights to equal protection and substantive due process are violated by his classification as a violent felon under section 667.5, subdivision (c)(15).

IV.

*Remand for Resentencing Under Section 1170, New Subdivision (b)*
*Is Required*

In sentencing Dorado, the trial court selected upper-term sentences for 16 of the 20 counts of conviction (counts 1–6 (pertaining to Jane 1), 12–15 (pertaining to Jane 2), 28–30 (pertaining to Jane 3), and 31, 32, and 34 (pertaining to Jane 4)). (See Appendix.) At the time Dorado was sentenced, section 1170, former subdivision (b), left it to the sentencing judge's "sound discretion" to select the appropriate term within a sentencing triad that "best serves the interests of justice." (§ 1170, former subd. (b), as amended by Stats. 2018, ch. 1001 (Assem. Bill No. 2942) § 1.)

At the sentencing hearing, the trial court discussed in detail the various factors it regarded as mitigating and aggravating, and concluded the factors in aggravation warranted imposition of upper term sentences. The factors in mitigation were Dorado's age, health, and charitable works; his lack of a significant criminal record; that he was a successful businessman who owned multiple businesses; that he was gregarious and sociable; and

that he did not appear to have reoffended during the several months he was released on bail and out of custody.

When addressing the factors in aggravation, the trial court recounted the trial evidence relating to Dorado's offenses against each victim and made dozens of detailed factual findings. The aggravating facts relied on by the court are too numerous to set forth in full here. They generally related to Dorado's character and personality; Dorado's offense conduct as to each of the four victims; the victims' character and behavior; and the impact of Dorado's offenses on each victim.[19] As an example, in discussing Dorado's character and personality, the court found Dorado "tailored his approach and interactions with [the victims] in a way that played to and preyed upon their vulnerabilities"; "presents as a highly forceful personality" who tried to tell the arresting detectives "how to do their job" and "when he needs to be advised of his *Miranda* rights" (italics added); and "was difficult to control on cross-examination." The court went on to discuss other aspects of Dorado's character and personality it regarded as aggravating, including his "complete

---

[19] The trial court did not tie the aggravating facts it identified to the circumstances in aggravation listed in this rule 4.421 of the California Rules of Court. However, the People assert the aggravating facts identified by the court supported the circumstances in California Rules of Court, rule 4.421(a)(1), (3), (8), (11), and (c). (See Cal. Rules of Court, rule 4.421(a)(1) ["The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness"], (a)(3) ["The victim was particularly vulnerable"], (a)(8) ["The manner in which the crime was carried out indicates planning, sophistication, or professionalism"], (a)(11) ["The defendant took advantage of a position of trust or confidence to commit the offense"], (c) ["Any other factors statutorily declared to be circumstances in aggravation or that reasonably relate to the defendant or the circumstances under which the crime was committed"].)

50

absence of acceptance of responsibility" as evidenced by his sentencing memorandum, in which Dorado blamed his convictions on "the Me Too movement, and . . . District Attorney politics."

The court also found that Dorado's conduct was "highly deceptive" and he committed the offenses "in a particularly egregious way." It found Jane 1 was "caused to vomit upon herself" and "experienced rectal bleeding" and was a "modest young woman" who was "significantly affected by this event." It found Dorado's "controlling conduct, his planning, his sophistication, and the fact of [the] injuries [to Jane 2's breasts] warrant[ed] the upper term[.]" It discussed Jane 3's recantation of her initial belief that she had been victimized and identified facts that showed her initial belief to be true. It observed, among other things, that the presentence report indicated Jane 3 had received funds from the Victim Compensation Program to pay for a home security system, a fact the court found "belies her claims that she did not feel victimized." It found Dorado's offenses against Jane 4 were "among the most heinous and narcissistic of all of his acts that were presented to the jurors," including because Dorado had played to her personal values in portraying himself to her before committing "vile and anti-social" sexual acts against her that caused her injury, including physical trauma to her breasts.

While Dorado's appeal was pending, the Legislature enacted Senate Bill 567, which made significant amendments to the determinate sentencing law under section 1170, former subdivision (b). (Stats. 2021, ch. 731, § 1.3.) Effective January 1, 2022, a "court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial

by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).) Bifurcation of such jury findings is also now required. (*Ibid.*) However, under the newly amended law, "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3).)

Dorado contends the amendments to section 1170, subdivision (b), implemented by Senate Bill 567 are ameliorative and apply retroactively to him under the rule of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*). Under the *Estrada* rule, we presume absent a contrary indication from the Legislature that ameliorative enactments apply retroactively to all defendants whose sentences are not final on the enactment's operative date. He requests that we vacate his sentence and remand his case for resentencing. In response, the People appropriately concede the amendments effected by Senate Bill 567 apply retroactively to this case under the *Estrada* rule. (See, e.g., *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039 ["The People correctly concede the amended version of section 1170, subdivision (b) that became effective on January 1, 2022, applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal."]; accord *People v. Lopez* (2022) 78 Cal.App.5th 459, 465 (*Lopez*) ["The People properly concede that Senate Bill No. 567's ameliorative amendments to section 1170, subdivision (b) apply retroactively to all cases not yet final as of January 1, 2022."]; *People v. Jones* (2022) 79 Cal.App.5th 37, 45 [defendant whose convictions remained nonfinal on appeal "entitled to retroactive application of the ameliorative changes effected by Senate Bill 567"].)

The People argue, however, that despite retroactive application of the newly amended version of section 1170, subdivision (b), to Dorado's sentence, remand for resentencing is not required because the record demonstrates the

trial court's failure to sentence Dorado in accordance with the new sentencing procedure was harmless error. They contend that if the jury had been asked to make a finding of the aggravating circumstances relied on by the trial court, it would have found "any number of the circumstances true" beyond a reasonable doubt. In a letter filed shortly before oral argument on appeal, the People cited *Lopez, supra,* 78 Cal.App.5th 459, *People v. Dunn* (2022) 81 Cal.App.5th 394 (*Dunn*), and *People v. Zabelle* (2022) 80 Cal.App.5th 1098 (*Zabelle*), regarding the harmless error analysis reviewing courts should undertake when determining whether error under current section 1170, subdivision (b), is prejudicial.

*Lopez*, *Dunn*, and *Zabelle* arrived at slightly different answers to the question of how to determine the harmlessness of a trial court's imposition of an upper term sentence in violation of section 1170, subdivision (b), as amended by Senate Bill 567. In *Lopez*, this court held the prejudice of this error should be determined using a two-step analysis. First, we analyze the prejudicial effect of the failure to submit to the jury those aggravating factors relied on by the trial court that required a true finding by a jury under the test set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*Lopez, supra,* 78 Cal.App.5th at p. 465.) We explained, "In order to conclude that the trial court's reliance on improper factors that were not found true by a jury or admitted by [the defendant] was not prejudicial, we would have to conclude beyond a reasonable doubt that a jury would have found true beyond a reasonable doubt *every factor on which the court relied*[.]" (*Id.* at pp. 465–466.) We further held that if all aggravating factors relied on by the court did not survive this first level of analysis, a second step of analysis was required. At this second step, we consider "whether it is reasonably probable that a more favorable sentence would have . . . been imposed absent the trial

court's improper reliance on such factors." (*Id.* at p. 467.) In other words, we consider the extent to which the reduction in aggravating factors impacted the outcome of the trial court's discretionary sentencing decision under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

We summarized the two-step analysis as follows: "[T]he initial relevant question for purposes of determining whether prejudice resulted from failure to apply the new version of the sentencing law is whether the reviewing court can conclude beyond reasonable doubt that a jury would have found true beyond a reasonable doubt *all* of the aggravating factors on which the trial court relied in exercising its discretion to select the upper term. If the answer to this question is 'yes,' then the defendant has not suffered prejudice from the court's reliance on factors not found true by a jury in selecting the upper term. However, if the answer to the question is 'no,' we then consider the second question, which is whether a reviewing court can be certain, to the degree required by [*Watson, supra*, 46 Cal.2d at p. 836], that the trial court would nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on only a single one of the aggravating factors, a few of the aggravating factors, or none of the aggravating factors, rather than all of the factors on which it previously relied. If the answer to both of these questions is 'no,' then it is clear that remand to the trial court for resentencing is necessary." (*Lopez, supra*, 78 Cal.App.5th at p. 467, fn. 11.)

In *Dunn*, the Fifth District Court of Appeal agreed with the majority of *Lopez*'s two-step harmless error analysis. (*Dunn, supra*, 81 Cal.App.5th at p. 408.) However, the *Dunn* court disagreed with *Lopez*'s conclusion that at the first step, *all* aggravating factors erroneously relied on by the trial court in imposing an upper term sentence must be reviewed under the *Chapman*

54

standard.  (*Dunn*, at p. 408.)  *Dunn* relied on *People v. Sandoval* (2007) 41 Cal.4th 825 (*Sandoval*), in which our high court held that a defendant's federal constitutional right to a jury trial on aggravating sentencing factors used to enhance a sentence imposed under the *former* determinate sentencing law is not violated so long as one aggravating factor meets the *Chapman* harmless error standard.  (*Sandoval*, at p. 839 ["if a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true *at least a single aggravating circumstance* had it been submitted to the jury, the Sixth Amendment error properly may be found harmless" (italics added)].)  *Dunn* held that at the first step of the prejudice analysis, a court of review must determine whether, to the level of certainty required by *Chapman*, *one* of multiple aggravating factors would have been found true by the jury beyond a reasonable doubt.  (*Dunn*, at pp. 408–409.)  The remaining aggravating factors pass muster so long as a court of review can say, to the degree of certainty required by *Watson*, that they would have been found true by the jury beyond a reasonable doubt.  (*Ibid*.)

The *Dunn* court articulated the two-step prejudice analysis this way: "The reviewing court determines (1)(a) beyond a reasonable doubt whether the jury would have found one aggravating circumstance true beyond a reasonable doubt and (1)(b) whether there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt.  If all aggravating circumstances relied upon by the trial court would have been proved to the respective standards, any error was harmless.  If not, the reviewing court moves to the second step of *Lopez*, (2) whether there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating

55

circumstances provable from the record as determined in the prior steps. If the answer is no, the error was harmless. If the answer is yes, the reviewing court vacates the sentence and remands for resentencing consistent with section 1170, subdivision (b)." (*Dunn, supra,* 81 Cal.App.5th at pp. 409–410.)

In *Zabelle,* the Third District Court of Appeal articulated a prejudice analysis very similar to the test proposed in *Dunn.* (See *Zabelle, supra,* 80 Cal.App.5th at pp. 1111–1112.) Like *Dunn, Zabelle* relied on *Sandoval* and held the reviewing court need identify only a single aggravating factor that withstands *Chapman* harmless error analysis. (*Zabelle,* at pp. 1111–1112.) If the court identifies one such factor, it then, "for each [of the remaining] aggravating fact[s], consider[s] whether it is reasonably probable that the jury would have found the fact not true." (*Id.* at p. 1112.) The reviewing court "must then, with the aggravating facts that survive this review, consider whether it is reasonably probable that the trial court would have chosen a lesser sentence had it considered only these aggravating facts." (*Ibid.*)

Whether we follow *Lopez, Dunn,* or *Zabelle,* on this record, we conclude that remand for resentencing is required. The trial court's failure to sentence Dorado in accordance with the sentencing procedure enacted by Senate Bill 567 cannot be deemed harmless under the analysis proposed by any of these cases.

Under the newly amended version of section 1170, subdivision (b), all of the aggravating facts relied on by the trial court in this case had to be stipulated to by Dorado or found true by the jury, but there was no such stipulation or true finding. The People claim this error was harmless because the jury "unquestionably" would have found true the following aggravating facts relied upon by the trial court: Dorado "acted with planning and

sophistication"; he took advantage of women who were vulnerable because they were seeking employment or a relationship; he used his position of trust to take advantage of the victims; he inflicted injuries on his victims; and he failed to accept responsibility for his offenses. Although the People claim evidence supporting these aggravating facts was presented at trial, they refer to the assertedly supporting evidence only in general terms, and they fail to provide any citations to the parts of the trial record where the supporting evidence can be located.

Of the numerous aggravating factors relied on by the trial court, the only one we can identify that surpasses the first level of harmless error analysis under *Lopez* or *Dunn/Zabelle* is the fact of the victims' physical injuries. Evidence of the physical injuries suffered by Jane 1, Jane 2, and Jane 4 was presented to the jury. Dorado disputed, to varying degrees, committing the conduct that caused their injuries. However, the jury's guilty verdict on the counts relating to these victims is an indication it accepted the forensic evidence and victim testimony and rejected Dorado's denials. A jury making such findings would not fail to additionally find that Dorado inflicted the injuries relied on by the trial court in selecting upper term sentences. We are therefore able to conclude, to the degree of certainty required by *Chapman*, that the jury would have found true beyond a reasonable doubt that Jane 1, Jane 2, and Jane 4 suffered the physical injuries identified by the trial court in imposing sentence (injury to Jane 1's rectum, and injury to Jane 2 and Jane 4's breasts).

However, we are unable to say, to the degree of certainty required by *Chapman* or *Watson*, that the jury would have found true the other aggravating sentencing facts relied on by the trial court. Many of the facts the People claim should withstand harmless error review were subjective—

57

such as the victims' vulnerability, Dorado's occupation of a position of trust, and Dorado's "planning and sophistication"—which makes it difficult to determine to any degree of certainty how the jury would have evaluated them. (See *Sandoval, supra,* 41 Cal.4th at p. 840 [describing victim vulnerability as a "subjective" sentencing factor].) Our review of the record does not support the conclusion the trial evidence of these factors was overwhelming. To pick one example, Dorado's sentencing memorandum, which the trial court relied on for its finding he failed to accept responsibility, obviously was not presented to the jury. Moreover, even to the extent the trial evidence touched on certain factors, the defense had no reason to present evidence at trial contesting those factors since the sentencing law at the time did not require presentation of aggravating sentencing factors to the jury. "It would be entirely speculative for us to presume, based on a record that does not directly address the aggravating factors, what a jury would have found true in connection with these factors." (*Lopez, supra,* 78 Cal.App.5th at p. 466.) As a result, we are unable to find to the degree of certainty required by *Chapman* or *Watson* that the other aggravating facts relied on by the trial court, apart from the facts relating to Jane 1, Jane 2, and Jane 4's physical injuries, would have been found true by the jury beyond a reasonable doubt.

Since fewer than all aggravating facts survive the first level of harmless error analysis, we must consider whether it is reasonably probable the trial court would have exercised its discretion to impose a lesser sentence if the only aggravating facts available to support its decision were the facts relating to the physical injuries Dorado inflicted on Jane 1, Jane 2, and Jane 4. (See *Lopez, supra,* 78 Cal.App.5th at p. 467, fn. 11; *Dunn, supra,* 81 Cal.App.5th at pp. 408–409; *Zabelle, supra,* 80 Cal.App.5th at p. 1112.) The

58

People claim we can conclude a reduction in aggravating facts would not have affected the trial court's sentencing decision. At oral argument, they pointed out that the court made statements during the sentencing hearing indicating its intent to impose a lengthy sentence. Specifically, the court said one of its sentencing objectives was "protection of the public by isolating Mr. Dorado from the public for as long as possible." And after sentencing Dorado to an aggregate term of 40 years, the court stated, "I don't mind saying this is the maximum that I believe I can impose under the law, and I do so deliberately[.]"

Despite these statements, we conclude there exists a reasonable probability the trial court would have selected lesser terms if the aggravating factors available to support its sentencing decisions were reduced to the extent just described. The court's statement about imposition of the maximum sentence under the law must be considered in light of its understanding of the sentencing discretion it possessed at the time, and on its view of the balance of the mitigating and aggravating factors before it. The court took great care and went into significant detail when explaining the facts underlying its decision to impose upper term sentences. We cannot conclude, on this record, that the court would have made the same sentencing choices if the aggravating facts available to support its decision were reduced from the dozens it initially relied upon, to just three—the physical injuries to Jane 1, Jane 2, and Jane 4. Instead, there is at least a reasonable probability the court would have viewed this sentencing scenario differently, and that it would have selected lesser terms as a result.

Consequently, we cannot affirm Dorado's sentence on the grounds urged by the People. We will instead vacate Dorado's sentence and remand so that Dorado can be resentenced under the current version of section 1170,

subdivision (b). On remand, the procedures set forth in *Lopez* shall apply. (See *Lopez, supra,* 78 Cal.App.5th at pp. 468–469.)

## V.

### *Remand for Resentencing Under the Current Version of Section 654 Is Required*

Next, Dorado contends he is entitled to be resentenced in accordance with Assembly Bill 518. Effective January 1, 2022, Assembly Bill 518 amended section 654 to provide in relevant part, "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision." (Stats. 2021, ch. 441, § 1, italics added.) Previously, under section 654, "the sentencing court was required to impose the sentence that 'provides for the longest potential term of imprisonment' and stay execution of the other term." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379 (*Mani*); *People v. Jones, supra,* 79 Cal.App.5th at p. 45.) "As amended by Assembly Bill 518, . . . section 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*Mani,* at p. 379.)

The trial court, applying the former version of section 654, imposed and stayed the upper term of six years on counts 1, 12, 28, and 31, and imposed and stayed the upper term of eight years on counts 2, 4, 6, 13, 15, 29, 32, and 34. The court imposed and executed the upper term of eight years on counts 3, 5, 14, and 30, and imposed and executed sentences of two years (one-third the middle term of six years (former § 1170.1, subd. (a))) on counts 7, 16, 33, and 35. It ran the executed sentences consecutively, for a total term of 40 years.

60

The parties agree the discretion newly conferred by Assembly Bill 518 changes the court's options with regard to which of these sentences to stay or execute. The People also concede the amendment to section 654 effected by Assembly Bill 518 applies retroactively to Dorado, as the amendment is ameliorative and his judgment was not final when it became effective. Their concession is well taken. (See, e.g., *Mani*, *supra*, 74 Cal.App.5th at p. 379 [Assembly Bill 518 applies retroactively to all nonfinal judgments under *Estrada*]; *People v. Jones*, *supra*, 79 Cal.App.5th at p. 45 [same].)

However, the People argue that a remand for resentencing is unnecessary. The People point out that the trial court, in sentencing Dorado, stated that one of its sentencing objectives was to "isolat[e] Mr. Dorado from the public for as long as possible," remarked that Dorado's offenses were "committed in a particularly egregious way," and found Dorado evinced "a complete absence of acceptance of responsibility." The People argue these statements show the court would not exercise its newly conferred discretion to execute Dorado's shorter sentences and stay the longer ones if we remanded for resentencing under the amended version of section 654.

Ordinarily, remand is the appropriate course when retroactive changes in law affect the sentencing court's discretion. This is so because " '[d]efendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391), and " 'a court that is unaware of its discretionary authority cannot exercise its informed discretion' " (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425). An exception to this requirement exists, however, in the circumstance where "the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*Gutierrez*, at p. 1391.) When " ' "the record

61

shows that the trial court would not have exercised its discretion even if it believed it could do so, then remand would be an idle act and is not required." ' " (*McDaniels*, at p. 425.)

Although the trial court's statements offer some indication of the court's sentencing inclinations, this is not an appropriate case in which to exercise our discretion to deny a remand as an idle act. We have already decided we must remand for resentencing on counts 1–6, 12–15, 28–32, and 34 under the amended version of section 1170, subdivision (b). We cannot predict what terms will be imposed on each of these counts when Dorado is resentenced. Without knowing what terms will be imposed, we cannot conclude the court would exercise its sentencing discretion under the amended version of section 654 as it did when it originally sentenced Dorado.

Consequently, we decline to affirm the trial court's initial sentencing decision with regard to which sentences to stay and which to execute. Instead, at resentencing, the court must make this determination anew under the amended version of section 654.

## VI.

*The Portion of the $154 Criminal Justice Administration Fee That Remained Unpaid as of July 1, 2021 Shall Be Vacated*

At sentencing, the trial court ordered Dorado to pay a criminal justice administration fee of $154 pursuant to Government Code section 29550.1, which has since been repealed. Dorado contends we should vacate the fee.[20] We agree in part.

---

[20] Dorado relies on newly enacted section 1465.9, which applies to other fees. The People construe Dorado's argument as though it is based on Government Code section 6111, and so do we.

As of July 1, 2021, Assembly Bill No. 1869 (2019–2020 Reg. Sess.), which repealed Government Code section 29550.1 and enacted Government Code section 6111, became effective. Under Government Code section 6111, subdivision (a), "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to Section 27712, subdivision (c) or (f) of Section 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." This court has previously held that Government Code section 6111 applies to nonfinal sentences, "but only to the extent of relieving those individuals of the burden of any debt that remains unpaid on and after July 1, 2021." (*People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 953.)

Accordingly, we will not vacate the entire $154 criminal justice administration fee imposed on Dorado pursuant to former Government Code section 29550.1, but we will vacate that portion of the fee that remained unpaid as of July 1, 2021.

## DISPOSITION

The sentence is vacated, and the portion of the $154 criminal justice administration fee imposed by the trial court pursuant to Government Code former section 29550.1 that remained unpaid as of July 1, 2021, is also

63

vacated. The case is remanded for resentencing consistent with this opinion. The judgment is affirmed in all other respects.

DO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.

Appendix—Summary of Counts

| Victim | Ct | Crime | Date | Verdict | Sentence |
|---|---|---|---|---|---|
| Jane Doe 1 | 1 | Sexual Assault (§ 220, subd. (a)) | 12/23/09 | Guilty | Stayed (upper term–6 years) |
| | 2 | Rape–Unconscious Person (§ 261, subd. (a)(4)) | 12/23/09 | Guilty | Stayed (upper term–8 years) |
| | 3 | Rape–Intoxicated Person (§ 261, subd. (a)(3)) | 12/23/09 | Guilty | Executed (upper term, full strength, consecutive–8 years) |
| | 4 | Sexual Penetration–Unconscious Person (§ 289, subd. (d)) | 12/23/09 | Guilty | Stayed (upper term–8 years) |
| | 5 | Sexual Penetration–Intoxicated Person (§ 289, subd. (e)) | 12/23/09 | Guilty | Executed (principal term, upper term–8 years) |
| | 6 | Sexual Penetration–Unconscious Person (§ 289, subd. (d)) | 12/23/09 | Guilty | Stayed (upper term–8 years) |
| | 7 | Sexual Penetration–Intoxicated Person (§ 289, subd. (e)) | 12/23/09 | Guilty | Executed (one-third middle term, consecutive–2 years) |
| Jane Doe 5 | 8 | Sexual Assault (§ 220, subd. (a)) | 5/14/14 | Hung | |
| | 9 | Sexual Penetration–Unconscious Person (§ 289, subd. (d)) | 5/14/14 | Hung | |
| | 10 | Sexual Penetration–Intoxicated Person (§ 289, subd. (e)) | 5/14/14 | Hung | |
| | 11 | Oral Copulation–Intoxicated Person (§ 288a, subd. (i)) | 5/14/14 | Hung | |
| Jane Doe 2 | 12 | Sexual Assault (§ 220, subd. (a)) | 4/27/15 | Guilty | Stayed (upper term–6 years) |
| | 13 | Rape–Unconscious Person (§ 261, subd. (a)(4)) | 4/27/15 | Guilty | Stayed (upper term–8 years) |
| | 14 | Rape–Intoxicated Person (§ 261, subd. (a)(3)) | 4/27/15 | Guilty | Executed (upper term, full strength, consecutive–8 years) |
| | 15 | Oral Copulation–Unconscious Person (§ 288a, subd. (f)) | 4/27/15 | Guilty | Stayed (upper term–8 years) |
| | 16 | Oral Copulation–Intoxicated Person (§ 288a, subd. (i)) | 4/27/15 | Guilty | Executed (one-third middle term, consecutive–2 years) |

| Victim | Ct | Crime | Date | Verdict | Sentence |
|---|---|---|---|---|---|
| | 17 | Sexual Penetration–Unconscious Person (§ 289, subd. (d)) | 4/27/15 | Hung | |
| | 18 | Sexual Penetration–Intoxicated Person (§ 289, subd. (e)) | 4/27/15 | Hung | |
| Jane Doe 6 | 19 | Sexual Assault (§ 220, subd. (a)) | 5/11/17 | Hung | |
| Jane Doe 7 | 20 | Sexual Assault (§ 220, subd. (a)) | 6/30/17 | Hung | |
| | 21 | Rape–Unconscious Person (§ 261, subd. (a)(4)) | 6/30/17 | Hung | |
| | 22 | Rape–Intoxicated Person (§ 261, subd. (a)(3)) | 6/30/17 | Hung | |
| | 23 | Sexual Penetration–Unconscious Person (§ 289, subd. (d)) | 6/30/17 | Hung | |
| | 24 | Sexual Penetration–Intoxicated Person (§ 289, subd. (e)) | 6/30/17 | Hung | |
| Jane Doe 8 | 25 | Sexual Assault (§ 220, subd. (a)) | 5/14/14 | Not Guilty | |
| | 26 | Sexual Penetration–Unconscious Person (§ 289, subd. (d)) | 5/14/14 | Not Guilty | |
| | 27 | Sexual Penetration–Intoxicated Person (§ 289, subd. (e)) | 5/14/14 | Not Guilty | |
| Jane Doe 3 | 28 | Sexual Assault (§ 220, subd. (a)) | 12/27/17 | Guilty | Stayed (upper term–6 years) |
| | 29 | Rape–Unconscious Person (§ 261, subd. (a)(4)) | 12/27/17 | Guilty | Stayed (upper term–8 years) |
| | 30 | Rape–Intoxicated Person (§ 261, subd. (a)(3)) | 12/27/17 | Guilty | Executed (upper term, full strength, consecutive–8 years) |
| Jane Doe 4 | 31 | Sexual Assault (§ 220, subd. (a)) | 1/21/18 | Guilty | Stayed (upper term–6 years) |
| | 32 | Oral Copulation–Unconscious Person (§ 288a, subd. (f)) | 1/21/18 | Guilty | Stayed (upper term–8 years) |
| | 33 | Oral Copulation–Intoxicated Person (§ 288a, subd. (i)) | 1/21/18 | Guilty | Executed (one-third middle term, consecutive–2 years) |
| | 34 | Oral Copulation–Unconscious Person (§ 288a, subd. (f)) | 1/21/18 | Guilty | Stayed (upper term–8 years) |

| Victim | Ct | Crime | Date | Verdict | Sentence |
|---|---|---|---|---|---|
| | 35 | Oral Copulation– Intoxicated Person (§ 288a, subd. (i)) | 1/21/18 | Guilty | Executed (one-third middle term, consecutive–2 years) |